**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dale Swift, | No. CV-18-01531-PHX-RM |
| Plaintiff, | **ORDER** |
| v. | |
| Wesco Insurance Company, et al., | |
| Defendants. | |

Pending before the Court is Defendants' Motion for Summary Judgment. (Doc. 46.) Plaintiff Dale Swift brought this lawsuit against Wesco Insurance Company and Amtrust North America, Inc. (collectively "Defendants"), raising various claims arising out of Defendants' delay in paying Plaintiff's workers' compensation claim. (Doc. 1.)[1] Defendants move for entry of summary judgment on Plaintiff's bad faith and punitive damages claims. (Doc. 46.) Defendants' Motion for Summary Judgment is now fully briefed, with Plaintiff having filed a Response (Doc. 57) and Defendants having filed a Reply (Doc. 62). For the reasons explained below, the Court will deny Defendants' Motion for Summary Judgment as to Plaintiff's bad faith claim and grant the Motion for Summary Judgment as to Plaintiff's claim for punitive damages.[2]

. . . .

---

[1] Plaintiff's claims against claims adjuster Sebastian Lara were dismissed previously. (Doc. 33.)

[2] Although Defendants request the Court hold oral argument on their Motion for Summary Judgment, the Court finds that the briefing adequately sets forth the issues and that this matter is suitable for disposition without oral argument.

## I.  Background[3]

On February 28, 2017, Plaintiff slipped and was injured while working for Biltmore Properties as a maintenance technician at an apartment building in Yuma, Arizona. (Doc. 47 ¶ 1). Plaintiff reported his injury to his supervisor, who informed Creative Business Resources ("CBR"), a company that handled human resources and workers' compensation matters for Biltmore Properties. (*Id.* ¶ 3.) CBR instructed Plaintiff to go to Pinnacle Healthcare to have his injury examined. (*Id.* ¶ 3.) Plaintiff states that he could not find Pinnacle Healthcare, and so instead went to Family and Injury Care. (*Id.* ¶ 4.) Plaintiff asserts that he chose to go to Family and Injury Care only because Biltmore had previously sent him there for treatment of a previous work-related injury. (Doc. 53, SSOF ¶ 6.)[4] John Smock, a physician assistant with Family and Injury Care, examined Plaintiff and recommended certain temporary work restrictions. (Doc. 47 ¶¶ 5-6.) Plaintiff returned to work briefly but claimed that he continued to experience pain. (*Id.* ¶ 7.) His supervisor instructed him again to go to Pinnacle Healthcare, which he did. (*Id.* ¶ 8.) Marlena Lopez, a nurse practitioner with Pinnacle Healthcare, examined Plaintiff, confirmed his injury, and released him to light duty with work restrictions similar to those required by Physician Assistant Smock at Family and Injury Care. (*Id.* ¶¶ 9-10.)

The next day, CBR contacted Plaintiff and advised him that his employer was offering him a light duty position consistent with the restrictions approved by Pinnacle Healthcare, and that his rate of pay and scheduled work hours would remain the same. (*Id.* ¶¶ 11-12.) The same day, Plaintiff was evaluated by Chiropractor Donald Cradic, who had also previously seen Plaintiff after a prior work-related accident. (*Id.* ¶ 14.) Chiropractor Cradic gave Plaintiff a temporary "no work" status, and Plaintiff informed CBR that he would not return to light duty because of this recommendation. (*Id.* ¶¶ 15-16.)

On March 7, 2017, Plaintiff spoke with Sebastian Lara, a claims adjuster with his employer's workers' compensation carrier. (*Id.* ¶ 17.) Defendants state that Mr. Lara

---

[3] Unless otherwise noted, the facts recounted here are undisputed.

[4] Docket entry 53 contains both Plaintiff's Response to Defendant's Statement of Facts ("RSOF") and Plaintiff's Separate Statement of Facts ("SSOF").

informed Plaintiff during that conversation that Plaintiff could not rely upon Chiropractor Cradic's "no work" recommendation unless he petitioned the Industrial Commission of Arizona for a change of treating doctor. (*Id.* ¶¶ 18-19.) Plaintiff denies that Mr. Lara said this. (Doc. 53, RSOF ¶¶ 18-19.) Plaintiff had previously gone through the process of officially changing his treating doctor but did not do so again because he believed he still had the right to choose his own doctor without going through this process. (Doc. 47 ¶¶ 21-23.)

In emails dated March 15 and March 17, CBR informed Plaintiff that his employer was revoking its offer of a light-duty position and was now requiring a "full duty release" before he would be allowed to return to work. (*Id.* at ¶ 28.) Defendant Lara was not contemporaneously copied on these emails. (*Id.* at ¶ 29.) A letter from CBR to Plaintiff dated March 20, 2017, also explained that Defendants would require "a Fitness for Duty with 'no restrictions' form from your chiropractor before you return to an active work status." (Doc. 53, SSOF ¶ 13.) On March 21, 2017, Mr. Lara denied temporary compensation benefits, stating that Plaintiff's employer was able to accommodate the restrictions set by Nurse Practitioner Lopez. (Doc. 47 ¶ 25; Doc. 53 ¶ 25.) Mr. Lara states that he was not aware that Plaintiff's employer was now requiring a full duty release, and he asserts that he would have released temporary benefits to Plaintiff if he had known. (*Id.* ¶ 30.)

In late March of 2017, Mr. Lara began receiving records from Chiropractor Cradic. (*Id.* ¶ 31.) On April 17, 2017, Mr. Lara scheduled Plaintiff to undergo a medical examination with John Beghin, MD, an orthopedic surgeon. (*Id.* ¶¶ 32-33.) After the examination and a later MRI, Dr. Beghin opined that Plaintiff did not need ongoing chiropractic care and that Plaintiff could perform light duty work with certain restrictions. (*Id.* ¶¶ 34-35.)

On May 18, 2017, Plaintiff filed a Request for Hearing challenging the denial of his temporary benefits. (*Id.* at ¶ 36.) The Request for Hearing noted that Plaintiff's employer was not offering him light duty and that Plaintiff's doctor (i.e., Chiropractor Cradic) had

him on temporary total disability. (*Id.* ¶ 37.) Mr. Lara received the Request for Hearing, and states that he "checked his file" to confirm that Plaintiff had been offered a light duty job but turned it down. (*Id.* ¶ 38.) Plaintiff asserts that whatever investigation Mr. Lara did was objectively unreasonable because he did not obtain or review CBR's communications to Plaintiff that a "full duty release" was required for Plaintiff to return to work. (Doc. 53, RSOF ¶ 38.)

On March 28, 2018, following hearings and the submission of evidence, an Administrative Law Judge ("ALJ") awarded Plaintiff temporary compensation benefits. (Doc. 47 ¶¶ 39-41.) The award became "final" after no objections were made after 30 days, and Mr. Lara paid the award on May 15, 2018, approximately 18 days later. (*Id.* ¶¶ 42-45.) Mr. Lara claims that the delay in paying the award was "unintentional" and happened because he "was used to receiving awards like this directly from the industrial commission," but instead received this award from Plaintiff's attorney and so "inadvertently overlooked it." (*Id.* ¶¶ 44-47.)

## II.   Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and show (1) that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and (2) that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the Court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the Court must accept the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The Court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III.   Discussion**

    **A.   Bad Faith Claim**

An insurer may be liable for bad faith if it denies a claim, refuses to process a claim, or refuses to pay a claim without a "reasonable basis." *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276 (Ariz. 2000) (en banc) (internal quotation marks and citation omitted). Arizona law recognizes that "[a]n insurance contract is not an ordinary commercial bargain" and that an insurer's duties of fairness and equal consideration are implied in such a contract. *Id.* The insurer is liable for bad faith when it "seeks to gain unfair financial advantage" by violating "the insured's right to honest and fair treatment." *Id.* at 279–80 (internal quotation marks and citation omitted.) The insurer "has an obligation to immediately conduct an adequate investigation, act reasonably in evaluating the claim, and act promptly in paying a legitimate claim." *Id.* at 280. More than mere negligence is required to prove a claim of bad faith. *Rawlings v. Apodaca*, 726 P.2d 565 (Ariz. 1986).

The crux of Plaintiff's bad faith claim is that Defendants established a claims processing system that unreasonably incentivized the closing of claims. (*See* Docs 1, 52.) Plaintiff argues that, due to these incentives, Mr. Lara unreasonably refused to accept Dr. Cradic as Plaintiff's treating provider, unreasonably failed to investigate the availability of

a light-duty position with Plaintiff's employer, and unreasonable delayed paying Plaintiff's benefits even after Plaintiff received an award from the ALJ. (Doc. 52.) For evidence that Defendants established unreasonable claims-closing incentives, Plaintiff cites to the testimony of claims adjuster Sebastian Lara, who explained during his deposition that he was evaluated for merit-based raises partly based on his success in closing claims. (Doc. 53-2 at 115-16.) Mr. Lara also added that he "didn't really know if that's really a key component" in employee evaluations. (*Id.* at 116.)

Defendants argue that Plaintiff has failed to present evidence that tracking a claims-closing ratio and factoring it into compensation decisions "was inappropriate." (Doc. 62 at 7.) However, while such a process may not be per se unlawful, courts have nonetheless held that an insurer's linking of employees' compensation to claim processing goals may be probative of bad faith. *See Zilisch*, 995 P.2d at 280 (finding as evidence of bad faith that "[t]he salaries and bonuses paid to claims representatives were influenced by how much the representative paid out on claims"); *see also Demetrulias v. Wal-Mart Stores Inc.*, 917 F. Supp. 2d 993, 1009 (D. Ariz. 2013) ("[S]etting arbitrary goals for reduction in claims paid or linking salaries and bonuses to claim payouts can be unreasonable.")

Defendants also argue that, at each stage of claim processing, they acted in good faith. First, Defendants argue that there was a reasonable basis for Mr. Lara's refusal to allow Plaintiff's chiropractor to become Plaintiff's authorized treating physician. Defendants argue that Plaintiff "decided to go to Family and Injury Care when he was unable to find the offices for Pinnacle Healthcare," and that Plaintiff therefore chose Family and Injury Care as his provider. (Doc. 46 at 8.) Defendants maintain that as Plaintiff already "chose" his provider, he was not entitled to choose Dr. Cradic as his provider without filing a petition to change physicians. (*Id.* at 9.)

Plaintiff, however, argues that he only went to Family and Injury Care because his employer had previously sent him there regarding a different work-related injury, and that Plaintiff repeatedly informed Mr. Lara that he believed Family and Injury Care was a provider "approved and chosen by [his] employer, based on [his] prior treatment at the

clinic." (Doc. 57 at 13.) Plaintiff has also presented evidence that Defendants' justification for not recognizing Dr. Cradic was pretextual, and that the real reason for Defendants' refusal is contained in Mr. Lara's claim notes, which state that Mr. Lara was "not accepting Dr. Cradic's office disability recommendations" because "claimaint chose a doctor and *did not get a release from the chiropractor*." (Doc. 53, SSOF ¶ 16 (citing Doc. 53-1 at 62-66) (emphasis added).) Plaintiff also disputes Defendants' assertion that Mr. Lara informed Plaintiff of the process for petitioning for a change of doctor. (Doc. 57 at 14 (citing Doc. 53, SSOF ¶ 27).) Based on this evidence, the Court finds that a triable issue of fact exists as to whether Mr. Lara acted in bad faith by refusing to recognize Dr. Cradic as Plaintiff's provider.

Second, Defendants argue that there was a reasonable basis to deny Plaintiff temporary compensation benefits. (Doc. 46 at 10-13.) Defendants maintain that Mr. Lara denied temporary compensation benefits because he mistakenly believed that Plaintiff's employer was able to offer a job within his work restrictions. (*Id.* at 11.) In reality, the light-duty position had been effectively revoked prior to the denial of Plaintiff's temporary benefits in March of 2018. Defendants assert that Mr. Lara was not copied on the communications from Plaintiff's employer requiring a "full duty release" and that there is no direct evidence in the claim notes demonstrating that Mr. Lara knew of those communications. (*Id.* at 12.)

Plaintiff responds that, even if Mr. Lara did not have actual knowledge of the revocation of the light-duty position, Defendants still acted in bad faith by failing to investigate the validity of the purported light-duty position. (Doc. 57 at 9.) Plaintiff points out that his attorney told Lara soon after the denial that no light duty position with the employer existed, and that he repeated this assertion in his Request for Hearing, which explained that the "[e]mployer has no light duty." (*Id.* (citing Doc. 53, SSOF ¶ 22).) Moreover, the letter revoking the light-duty offer was served on Amtrust's lawyer by August 30, 2018, approximately eight months before the claim was paid. (Doc. 53, SSOF ¶ 17.) There is therefore a triable issue as to whether Defendants acted in bad faith by

failing to conduct a reasonable investigation before denying Plaintiff's temporary benefits.

Third, Defendants argue that the delay in paying benefits after the ALJ issued her decision was not caused by bad faith. (Doc. 46 at 13.) The ALJ issued her decision awarding Plaintiff benefits on March 28, 2018, and the award was not paid until May 15, 2018. Defendants argue that the award did not become "final" until the 30-day period for appeals elapsed on April 27, 2018, and so it only took 18 rather than 48 days to pay the award. (*Id.*) Defendants also argue that the delay was caused because Mr. Lara simply "overlooked" an email containing the ALJ decision, and so "any delay in the payment of the award in this case was at most negligent." (*Id.* at 14.)

In support of their argument, Defendants cite to *Rawlings* for the proposition that such a minor oversight does not constitute bad faith. (Doc. 46 at 14.) As the *Rawlings* court explained, "Insurance companies, like other enterprises and all human beings, are far from perfect. Papers get lost, telephone messages misplaced and claims ignored because paperwork was misfiled or improperly processed. Such isolated mischances may result in a claim being unpaid or delayed [but will not] ordinarily constitute a breach of the implied covenant of good faith and fair dealing." *Rawlings,* 726 P.2d at 573. However, the "overlooked" email here was arguably not an "isolated mischance[]" because it was one of a series of purported errors that caused a significant delay in the payment of Plaintiff's benefits. Given the totality of the evidence here, the Court finds that there is a triable issue of fact as to whether Mr. Lara acted in bad faith in delaying payment of the ALJ award.

Finally, Defendants argue that Plaintiff's bad faith claim should be dismissed based on a lack of evidence of subjective intent. (Doc. 46 at 14.) In addition to objectively unreasonable conduct, a plaintiff claiming bad faith must also demonstrate that the defendant "either knew its conduct was unreasonable or acted with such reckless disregard that knowledge that the conduct was unreasonable can be imputed to the defendant." *Milhone v. Allstate Ins. Co.*, 289 F. Supp. 2d 1089, 1102–1103 (D. Ariz. 2003). Defendants assert without much discussion that the record contains "no evidence of subjective unreasonableness" and that "the only evidence is that the claims adjuster believed that he

1  handled Plaintiff's claim in an appropriate manner." (Doc. 46 at 15.)

2  Plaintiff makes three responses. First, Plaintiff argues that Defendants' failures to investigate are sufficient as a matter of law to establish a reckless disregard for the unreasonableness of its conduct. (Doc. 57 at 15.) Second, Plaintiff argues that the claims closing incentives are probative of intentional conduct. (*Id.*) Third, Plaintiff argues that the claims note in which Mr. Lara stated that he was "not accepting Dr. Cradic's office disability recommendations" because "claimant chose a doctor *and did not get a release from the chiropractor*," is evidence that Mr. Lara knew the denial was pretextual and unreasonable. Taking the evidence as a whole, a reasonable jury could conclude that Defendants either knew their handling of the claim was unreasonable or acted with reckless disregard for the reasonableness of their conduct.

Accordingly, the Court finds there are triable issues of fact with regards to Plaintiff's bad faith claim, and the Court will deny Defendants' Motion for Summary Judgment (Doc. 46) as to that claim.

### B. Punitive Damage Claim

In Arizona, punitive damages are an "extraordinary civil remedy . . . which should be appropriately restricted to only the most egregious of wrongs." *Linthicum v. Nationwide Life Ins. Co.*, 723 P.2d 675 (Ariz. 1986) (en banc). The touchstone of the punitive damages analysis is a defendant's "evil motives." *Rawlings*, 726 P.3d at 578. Thus, to prevail on a claim for punitive damages, the "plaintiff must prove that [a] defendant's evil hand was guided by an evil mind." *Id*. An "evil mind" can be found only when the defendant either intends to injure the plaintiff or when the defendant "consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." *Id.* In addition, "recovery of punitive damages should be awardable only upon clear and convincing evidence of the defendant's evil mind." *Linthicum*, 723 P.2d at 681. The "question of whether punitive damages are justified should be left to the jury if there is any reasonable evidence which will support them." *Farr v. Transamerica Occidental Life Ins. Co. of California*, 699 P.2d 376, 384 (Ariz. App. 1984).

Here, there is no "reasonable evidence which will support" Plaintiff's claim for punitive damages. *Id.* Plaintiff has not presented evidence that Defendants either intended to injure Plaintiff or consciously disregarded a substantial risk of significant harm to Plaintiff. Plaintiff instead asserts that "Defendant acted intentionally to hurt [Plaintiff] because it incentives its adjusters to target claims and tied that target to the adjuster's bonus." (Doc. 57 at 17.) As Plaintiff has not provided any evidence that the incentive structure was designed for the purpose of harming him, it appears that Plaintiff is proceeding on a theory that Defendants "consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." *Rawlings*, 726 P.2d at 578. However, the harm alleged here is limited to the delay in Plaintiff's receipt of his benefits. To the extent that Defendants may have "consciously disregarded a substantial risk" that its incentive structure would lead to wrongful claim denials, Plaintiff has presented no evidence that the denial of a workers' compensation claim caused Plaintiff the kind of "significant harm" that would justify punitive damages. Moreover, even if Plaintiff had suffered the kind of "significant harm" that might give way to punitive damages, Plaintiff has still has not established that Defendants were subjectively aware of and consciously disregarded a substantial risk of such significant harm.

Plaintiff relies heavily on *Mendoza v. McDonald's Corporation*, which held that the issue of punitive damages should have gone to the jury in an action arising from a denied workers' compensation claim. 213 P.3d 288 (Ariz. App. 2009). The *Mendoza* court found that the plaintiff there had presented sufficient evidence to allow a jury to make a finding of conscious disregard of significant harm. *Id.* at 308. However, that case involved significant harm beyond the initial denial of benefits because "McDonald's consciously waited many months before approving carpal tunnel surgery" even though it was warned by a physician that "delay in treating Mendoza's carpal tunnel condition could lead to permanent injury." *Id.* at 307-08. McDonald's also scheduled an independent medical examination to support the denial, as well as engaging in other egregious misconduct. *Id.* The *Mendoza* Court found based on these facts that a "jury could conclude McDonald's

had engaged in impermissible 'doctor shopping' *in conscious disregard of the likely deterioration in Mendoza's medical condition.*" *Id.* at 308 (emphasis added). Here, Plaintiff has presented no evidence that he suffered harm similar to that suffered by the plaintiff in *Mendoza*, much less that Defendants consciously disregarded a risk of significant harm.

Plaintiff also cites *Nardelli v. Metro Group Property & Casualty Insurance Company*, 277 P.3d 789 (Ariz. App. 2012). In that case, the court inferred intentional conduct from a striking set of facts. *Id.* at 802. The court found that the defendant insurance company instituted extraordinarily aggressive claims processing procedures in order to compensate for a lack of revenue. *Id.* The court found that the defendant (1) "instituted an aggressive company-wide profit goal"; (2) "assigned the claims department a significant role in achieving that goal"; (3) "aggressively communicated this goal to the claims department"; (4) "tied the benefits of claims offices and individuals to the average amount paid on claims; and (5) "implemented these actions without taking steps to ensure its efforts to drive up corporate profits would not affect whether it treated its insureds fairly." *Id.* Here, in contrast, Plaintiff has at most established that claims processing incentives played some role in claims adjusters' compensation. This is insufficient for a reasonable jury to infer intentional misconduct and award punitive damages. The Court will grant Defendants' Motion for Summary Judgment as to the punitive damages claims.

**IV.   Conclusion**

The Court will partially grant and partially deny Defendants' Motion for Summary Judgment. The Court will grant Defendants' Motion for Summary Judgment as to Plaintiff's punitive damages claim but deny the Motion as to Plaintiff's bad faith claim.

Accordingly,

. . . .

. . . .

. . . .

. . . .

. . . .

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 46) is **granted in part and denied in part**. The Motion is granted as to Plaintiff's claim for punitive damages and denied as to Plaintiff's bad faith claim.

Dated this 10th day of July, 2020.

_____
Honorable Rosemary Márquez
United States District Judge